## EUGENE N. HOOPER

### V.

## ANTHONY F. MUSOLINO, ET AL.

Record No. 841603

January 15, 1988

Present: Carrico, C.J., Poff, Compton, Stephenson, Thomas, and Whiting, JJ., and Cochran, Retired Justice.

*John F. Kay, Jr. (Stephen A. Northup; John R. Easter; Douglas J. Sanderson; Mays, Valentine, Davenport & Moore; Bettius, Fox and Carter, P.C., on briefs), for appellant.*

*Dexter Odin; Harvey B. Cohen (Thomas J. Shaughnessy; Sally Ann Hostetler; Odin, Feldman & Pittleman, P.C.; Cohen, Gettings, Alper & Dunham, on brief), for appellees Anthony F. Musolino, North Duke Mall Limited Partnership and John W. Warner.*

No brief or argument for appellee Charles S. Warner.

POFF, J., delivered the opinion of the Court.

This is an appeal from a judgment in a suit for an accounting. The final decree ordered Eugene N. Hooper to pay to North Duke Mall Limited Partnership (the partnership) the sum of $8,430,000 as damages resulting from Hooper's negligence in the conduct of the partnership's affairs, his wrongful appropriation of partnership property, and his breach of a contract for the construction of an improvement on partnership property.

By agreement dated February 1973, Hooper and three other persons formed a limited partnership for the purpose of acquiring and developing two tracts of land, parcels A and B, in Durham, North Carolina, as a shopping center. Hooper and Charles S. Warner signed the partnership agreement as both general and limited partners and were joined by Eugene R. House and S. Parker Oliphant (as nominee for John W. Warner) as limited partners. House later assigned his interest to Charles Warner and Oliphant. Anthony F. Musolino acquired a 15% interest as a limited partner on April 25, 1974. Hooper's combined interests were 45%, Charles Warner's interests totaled 15%, and Oliphant's interest was 25%.

In March 1974, the partnership engaged Hooper as general contractor to build a shopping center on parcel A at a contract price of $2,632,073. Hooper acquired performance bonds from Safeco Insurance Company of America (Safeco). On May 2, 1974, the partnership obtained a construction loan from Mortgage

Investors of Washington (MIW) in the principal amount of $3,920,000, secured by a first deed of trust on the project. Hooper and his wife, Celeste Hooper, personally guaranteed repayment of the loan.

Thereafter, Hooper commenced construction but was unable to complete the project within the time prescribed in the construction contract and the loan agreement. By August 6, 1975, the project still was not complete, the partnership was in default under its loan agreement, and the partnership and MIW entered into a new loan agreement. In exchange for a forbearance of MIW's right to foreclose and continued disbursement of funds, each of the partners was required to contribute additional capital, and October 15, 1975 was set as the new date for completion.

By July 28, 1976, Hooper had not yet completed construction of the project, MIW had instituted foreclosure proceedings, and the parties entered into a "workout" agreement. In exchange for MIW's agreement to terminate the foreclosure proceedings, to take over completion of the project, and to disburse the balance of the loan proceeds, the partnership promised to deposit $200,000 with MIW for use in paying delinquent debts and in completing construction of the project. In a "buyout" agreement required by the workout agreement and executed the same day, Hooper purchased Charles Warner's partnership interests for $11,000. This raised Hooper's combined interests to 60% of the partnership. In the buyout agreement, Hooper agreed to indemnify Warner against all claims arising from his status as a general partner and to "assume all liability for . . . all debts of the . . . Partnership". Also as a part of the workout agreement, the partnership and MIW, joint obligees on Hooper's payment and performance bonds, released Safeco from all liability as surety in exchange for Safeco's payment of $200,000 to the partnership and MIW. The partnership relinquished its rights in that payment in satisfaction of its obligation to deposit $200,000 with MIW.

The project finally was completed September 1, 1978, but because rental income from the completed units was insufficient to satisfy the partnership's obligations under its loan agreement, MIW foreclosed on the project. Parcel A, as improved, was bid in at the foreclosure sale for $4,500,000. The balance due on the construction loan was more than $5,000,000. In a "settlement" agreement dated October 22, 1979, MIW released the partnership and the guarantors, Eugene and Celeste Hooper, from any liabil-

ity for the deficiency in exchange for the Hoopers' payment of $340,000 to MIW. MIW also foreclosed under a separate deed of trust on parcel B, the unimproved tract adjacent to the shopping center. Hooper and his wife subsequently acquired that parcel from MIW for a stated consideration of $130,000.

By bill of complaint filed August 12, 1977, Musolino sought an accounting of the affairs of the partnership. Musolino named Hooper, Charles Warner, and the partnership as party respondents. Musolino alleged that Hooper, in his role as a general partner, "failed to discharge his fiduciary duties" and "misused, misappropriated and diverted" partnership funds, and in his role as contractor, failed to perform the work as required under the construction contract. Hooper denied the substantial allegations of the bill, and the chancellor referred the matter to a commissioner in chancery. The decree instructed the commissioner to file a complete accounting of the assets and liabilities of the partnership from the time of its inception and to ascertain whether Hooper or Charles Warner owed any monies to the partnership or to Musolino.

By order entered September 29, 1978, the court found that Hooper had made no effort to respond to Musolino's discovery requests and ordered Hooper to file answers to interrogatories and to produce the books and records of the partnership. Hooper failed to comply with the order, and on November 6, 1978, the court entered a new discovery order, assessed costs and legal fees against Hooper, and took under advisement the question whether to award judgment against Hooper in the amount of Musolino's investment in the partnership.

In April 1980, the commissioner entered an order requiring Hooper to produce all the records and books of the partnership. After taking depositions, the commissioner submitted his first report on April 2, 1982, finding that:

> Eugene Hooper has failed to make a complete accounting of the assets, liabilities, receipts and disbursements of all the funds of the partnership, nor can a complete accounting be made because of his failure to comply with the Order of this Commissioner requiring the production of all books, papers, vouchers, documents and writings necessary to provide such a complete accounting . . . .

Based on the books and records available to the commissioner, he concluded that Hooper had commingled his own accounts and funds with those of the partnership.

The commissioner further found that the construction contract between Hooper and the partnership was a "fixed-price" contract, but that insurance and construction bond premiums, electricity costs, cost overruns, subcontractors' expenses, other construction costs, and certain personal obligations all were treated by Hooper as partnership construction costs. The commissioner stated that:

> Eugene Hooper's neglect of the project, poor management, unavailability during critical periods during the construction, and failure to respond to job needs had a serious and adverse effect, on the project, causing delays which resulted in problems with anchor tenants, subcontractors and the leasing program, directly causing inability to obtain permanent financing and also causing failure of the project.

In addition, the commissioner reported that Hooper had released Safeco from its obligations to the partnership as surety on the performance bonds and had failed to dissolve the partnership (as required by the partnership agreement) when Hooper became the sole general partner. These actions by Hooper, the commissioner concluded, "amounted to a conversion to his own personal use of all the partnership assets, and coupled with the express terms of the partnership agreement, make Eugene Hooper liable to . . . Musolino for the return . . . of his investment".

Finally, the commissioner reasoned that, in purchasing the interests of Charles Warner in the partnership, Hooper "assumed all liability for all the unpaid bills and accounts outstanding against the partnership as of that date, and assumed liability for all debts of the partnership and defense of all lawsuits which have or might arise against the partnership".

Hooper filed exceptions to virtually every factual and legal finding of the commissioner, and the court sustained several. Musolino filed four exceptions to the report. The court sustained each and remanded the cause to the commissioner with instructions to determine whether Hooper was liable:

> 1. For the damages sustained by the Partnership as a result of Mr. Hooper's neglect of his partnership obligations;

2. For the sums due as a result of Mr. Hooper's failure to perform the contractual obligations to the partnership;

3. For those sums which Mr. Hooper took from the Partnership in excess of those due him; and

4. For the Partnership property lost due to Mr. Hooper's failure to perform both partnership and contractual obligations.

After considering memoranda of law, the commissioner filed his second report dated October 11, 1983. The commissioner rejected Hooper's claims of credits for capital contributions on the ground that Hooper had not documented any such contributions. The commissioner also found that Hooper's financial exhibit provided "no more substantial purpose at times than to show activity in and relating to the various accounts" and that "reconciliation of the accounts [was] impossible."

The commissioner found that the partnership suffered a loss of two parcels of land due to Hooper's negligence and his failure to perform partnership and contractual obligations. With respect to the first and fourth inquiries on remand, the commissioner ascertained that "Parcel A, lost by foreclosure, is valued at $4,500,000.00, and Parcel B, which was converted by Mr. Hooper to his own personal use, is valued at $130,000.00". Hooper could claim no offsets or deductions against these amounts, the commissioner reported, because Hooper had assumed a personal obligation in the buyout agreement to pay the partnership debts.

With respect to the second inquiry, the commissioner found that "$3,800,000.00 [in partnership funds] was known to be contributed to construction costs as of December, 1976," and that, as of that date, construction of the project was not complete. The commissioner ruled that Hooper owed the partnership the entire amount without any credit for the value of labor and materials furnished by him to construct the project because he "did not substantially perform the contract or complete the job in a manner which would entitle him to any equitable remedies."

Regarding the third inquiry, the commissioner concluded that Hooper's failure to keep and produce accurate financial records prevented a calculation of "those sums which Mr. Hooper took from the Partnership in excess of those due him".

Hooper filed exceptions to the second commissioner's report, challenging, among other things, the evaluation of parcel A; the

finding that Hooper was entitled to no equitable remedies; and the conclusion that the partnership was entitled to damages for both the full value of the improved property *and* the cost of the improvements. On July 20, 1984, the court delivered its opinion from the bench. The court ruled that the commissioner was correct in evaluating parcel A without any offset for encumbrances because Hooper, in his buyout agreement with Charles Warner, had assumed liability for all the partnership debts, including the construction loan. The court reasoned that the partnership had suffered a loss of the full value of the property because Hooper, and not the partnership, was obligated to pay off the encumbrances. The court also found that, because the commissioner reported that Hooper was not entitled to any equitable remedies, the partnership's recovery of both the value of the improved property and the cost of the improvements was not a double recovery; Hooper was liable for his negligence as a general partner on the one hand, and for his breach as a contractor on the other.

In a final decree entered on July 26, 1984, the chancellor ordered Hooper to pay to the partnership $8,430,000 with interest from the date of judgment and to pay Musolino costs. Additionally, the decree dissolved the partnership, directed Musolino and John Warner to wind up its affairs, and ordered Hooper to secure an appeal bond for $3,372,000, representing 40% of the judgment — the combined interests in the judgment to which Musolino and John Warner would be entitled absent any outstanding debts owed by the partnership. Finally, the decree authorized the court's general receiver to sell Hooper's partnership interests should Hooper fail to satisfy the judgment within 21 days.

We granted Hooper an appeal limited to consideration of the questions whether the chancellor erred in determining the amount of the judgment, in entering judgment in favor of the partnership, and in authorizing the sale of Hooper's partnership interests. Section 8.05 of the partnership agreement provides that the rights of the partners shall be governed and construed according to the law of North Carolina, and because that state is reasonably related to the purpose of the agreement, we will apply the parties' choice of substantive law. *See Tate* v. *Hain*, 181 Va. 402, 410, 25 S.E.2d 321, 324 (1943); *C.I.T. Corporation* v. *Guy*, 170 Va. 16, 22, 195 S.E. 659, 661 (1938).

Under settled choice-of-law principles, however, we will apply our own law in matters that relate to procedure. *Willard* v.

*Aetna*, 213 Va. 481, 482-83, 193 S.E.2d 776, 778 (1973); *Baise* v. *Warren*, 158 Va. 505, 508, 164 S.E. 655, 656 (1932). Our review of the record discloses that Hooper failed to object to the partnership as a party to the suit and, thereby, failed to preserve the question whether the chancery court lawfully could render judgment in favor of the partnership. Consistent with our contemporaneous objection rule, we will not consider the argument Hooper makes for the first time on appeal. Rule 5:25.

Hooper's primary contention on appeal is that the judgment entered below will "unjustly enrich the limited partners at Hooper's expense." Hooper argues that Musolino and John Warner "invested less than $350,000 in a partnership venture that completely failed [and] that was never even completed by the Partnership". Acknowledging that, under the appeal as limited, Hooper's liability for the partnership's failure is not subject to challenge, Hooper asserts that the limited partners' recovery should be confined to the amount of their investment.

In support of his position, Hooper cites *Roper* v. *Thomas*, 60 N.C.App. 64, 298 S.E.2d 424 (1982), *petition denied*, 308 N.C. 191, 302 S.E.2d 244 (1983), and Section 59-10 of the General Statutes of North Carolina.[1] Subsection (a)(2) of that statute authorizes a suit for an accounting, and Hooper contends that the *Roper* court held that, whenever a partnership has failed and realized no profit, "the remedy of the limited partners is restricted, by statute [§ 59-10(b)], to the return of their investment."

We do not share Hooper's interpretation of the decision in *Roper*. The prayer for relief in *Roper* sought nothing more than a return of the limited partner's investment. And as the court in that case recognized, it was not reviewing a suit for an accounting brought pursuant to § 59-10 but an action at law for the general partners' breach of the partnership agreement, their negligence,

---

[1] **§ 59-10. Rights of a limited partner.**
    (a) A limited partner shall have the same rights as a general partner to
        (1)   Have the partnership books kept at the principal place of business of the partnership, and at all times to inspect and copy any of them,
        (2)   Have on demand true and full information of all things affecting the partnership, and a formal account of partnership affairs whenever circumstances render it just and reasonable, and
        (3)   Have dissolution and winding up by decree of court.
    (b) A limited partner shall have the right to receive a share of the profits or other compensation by way of income, and to the return of his contribution as provided in G.S. 59-15 and 59-16.

and their misappropriation of partnership funds. 60 N.C.App. at 70, 298 S.E.2d at 427. As relevant to this case, the decision in *Roper* merely stands for the proposition that, in cases in which a court finds that a general partner's negligence has proximately caused injury to a limited partner, the limited partner is entitled to recover his investment. *Id.* at 74-75, 298 S.E.2d at 430-31. We hold that the possibility of an eventual recovery by Musolino and John Warner above their investments is not inconsistent with the decision in *Roper*, with any North Carolina statute, or with any provision of the partnership agreement defining a general partner's liability to the partnership or to another partner.[2]

Hooper challenges the circuit court's assessment of $4,500,000 against him as the value of the improved property lost to foreclosure. He points out that the proceeds of sale were applied against the balance due on the partnership's loan and that, in consideration of his payment on the deficiency, MIW extinguished the debt and released the deed-of-trust lien on the property. Nevertheless, the circuit court held that Hooper was liable to the partnership for the entire value of the improved property and "refused to offset that amount by the Partnership indebtedness which was extinguished by MIW's purchase." According to Hooper, "While the court recognized that, under ordinary circumstances, the Partnership would have had no equity in the shopping center property, it held that Hooper in his agreement with Charles Warner of July 28, 1976 . . . had 'assumed all liability for all of the partnership's debts' and that the debt to MIW 'should have been paid by Hooper, thereby relieving the partnership of the debt it had owed on the property.' "

---

[2] In pertinent part, the partnership agreement provides:

2.02(c). . . . No General Partner shall have personal liability for the repayment of the capital contributions of the Limited Partners except as provided in Section 2.05 and for misconduct, fraud or negligence not otherwise provided in Section 8.02.

. . . .

8.02. . . . Neither the Partnership nor any Partner shall have any claim against any General Partner by reason of any act or omission of the same provided that such acts or omissions were performed in the good faith belief that he was acting within the scope of his authority under this Agreement and that the General Partner was not negligent or guilty of misconduct with respect to such actions or omissions. Except as provided herein or required by law, no General Partner shall have any obligation or liability to any other Partner or to make any advance to, or contribution to the capital of, the Partnership.

Nothing in these provisions would limit a recovery by a limited partner to the return of his capital contribution.

Hooper contends that the court misconstrued his buyout agreement with Charles Warner. We agree. A contract must be construed as a whole to determine the parties' intent with respect to specific provisions. *Jackson* v. *Bumgardner*, 318 N.C. 172, 186, 347 S.E.2d 743, 751 (1986); *Crosby* v. *Bowers*, 87 N.C.App. 338, 345, 361 S.E.2d 97, 102 (1987). The specific provision underlying the chancellor's ruling is set out in the margin.[3] Looking to the buyout agreement in its entirety, we find that when Hooper purchased Warner's interests in the partnership, he agreed to assume Warner's obligations as a general partner and to hold Warner harmless from any liability arising out of his status as such. Prior to the buyout, Hooper and Warner, as general partners, were jointly and severally liable for all debts of the partnership, *see* N.C. Gen. Stat. §§ 59-9, -45 (1982), but "[i]t is well settled that each partner has the right to insist that partnership assets be applied in payment of partnership debts . . . [when] the affairs of the partnership have to be wound up, or the share of a partner has to be ascertained," *Wolfe* v. *Hewes*, 41 N.C.App. 88, 91, 254 S.E.2d 204, 206 (citing *Casey* v. *Grantham*, 239 N.C. 121, 126, 79 S.E.2d 735, 738 (1954)), *petition denied*, 298 N.C. 206 (1979). By entering into the buyout agreement, Hooper assumed no liability for partnership debt other than that owed by Warner. In essence, Hooper assumed no obligation that he, as a general partner, did not already have; he merely lost his right to contribution from a fellow general partner. *See Econo-Travel Motor Hotel Corp.* v. *Taylor*, 45 N.C.App. 229, 233-34, 262 S.E.2d 869, 872-73, *rev'd on other grounds*, 301 N.C. 200, 271 S.E.2d 54 (1980).

In addition to his liability as a general partner, Hooper, together with his wife, had personally guaranteed the partnership's repayment of the loan. When the proceeds of the sale of parcel A were applied to the construction loan, a deficiency remained. Pursuant to the settlement agreement, Hooper and his wife paid $340,000 to MIW, thereby relieving himself and his wife from

---

[3] The total of all unpaid bills and accounts outstanding against the . . . Partnership as of the date of this Agreement . . . whether in the form of a bill or account, or whether having been reduced to a lawsuit for collection on a bill or account . . . shall be assumed by Purchaser, and Purchaser shall assume all liability for these and all debts of the . . . Partnership, and defend all lawsuits which have or might arise against the . . . Partnership, and/or Charles S. Warner, as a General Partner or individually in connection with the . . . Partnership.

their obligations as guarantors, the partnership from its obligation on the loan, and Hooper from his obligation as the sole general partner to pay any debt left unsatisfied by partnership assets. With the debt extinguished, the obligation respecting the loan that Hooper had assumed under the buyout agreement was discharged. Because the partnership had no equity in the property, it lost nothing in the foreclosure. Accordingly, we will reverse that portion of the decree that awarded the partnership damages for the unencumbered value of parcel A.

Addressing the breach of contract claim, the chancellor awarded the partnership $3,800,000, the amount known to have been contributed by the partnership to construction costs on the project. Hooper contends that the amount of the award "is grossly inflated and unquestionably incorrect" in that, inconsistent with a proper measure of damages for breach of contract, the "award gives Hooper no credit for the labor, materials and other expenditures made by him in constructing the shopping center and which contributed to most if not all of its value."

In response, appellees say that "Hooper paid himself $3,800,000 for work he had agreed to do for $2,600,000 but never did." Appellees argue that Hooper's contention that the court applied an inappropriate measure of damages ignores the fact that the breach-of-contract issues arose in a suit requiring a fiduciary to account.[4] In such a suit, appellees assert, a partner who has taken funds from the partnership has the burden of proving his right to the funds. They point out that, in the trial court, Hooper based his entitlement to the funds solely on an allegation of a "cost-plus" construction contract. The commissioner found and the court agreed that Hooper had committed himself to a "fixed-price" contract. Appellees conclude that, having failed to carry his burden of proof, Hooper was not entitled to any of the funds he took and must return them to the partnership. Also, having failed substantially to perform under the construction contract, Hooper was not entitled to the price fixed in that contract or to any credit for the cost of labor and materials supplied.

The chancellor concluded that, because Hooper had voluntarily assumed fiduciary duties to the partnership, his treatment of the

---

[4] In fact, Hooper argues on brief, as he did in his petition for appeal, that the court properly should not have awarded damages for breach of contract in a suit for an accounting. His petition was refused as to this assignment of error, and we decline to rule on a question not presently before the Court.

construction business and the partnership as one entity "left himself open as part of his fiduciary duties to account in one proceeding for the issue of whether he complied with the terms of the construction contract and resultant damages to the partnership." In this suit for an accounting, the court found that Hooper had failed to account for the funds contributed to construction costs because Hooper had not substantially performed under the contract, and had not kept and produced records of the partnership's funds sufficiently separate and distinct from construction accounts to enable the commissioner to determine what part of the $3,800,000, if any, Hooper had earned.

We hold that Hooper, as a fiduciary in his role as managing partner, had the burden of demonstrating his entitlement to funds taken from partnership accounts. *See McNeill* v. *McNeill*, 223 N.C. 178, 181, 25 S.E.2d 615, 617 (1943); *Stone* v. *McClam*, 42 N.C.App. 393, 400, 257 S.E.2d 78, 83, *petition denied*, 298 N.C. 572, 261 S.E.2d 128 (1979). The fact that Hooper also was the general contractor who had breached a contract with the partnership did not transform the chancery proceedings below into an action at law for damages in which the partnership, as plaintiff, would have had the burden of proving its damages. If such were the case, Hooper, by deliberate nonfeasance of his duty as managing partner to keep the records and books, could frustrate the partnership's efforts to retrieve any funds he may have converted to his personal use. We decline to permit Hooper to benefit from his failure to carry out his fiduciary duties. Finding overwhelming evidence in the record to support the court's ruling that Hooper failed to perform his covenants as general contractor and produced no records and books sufficient to justify the funds contributed by the partnership to construction costs, we hold that the chancellor did not abuse his discretion in ordering Hooper to return $3,800,000 to the partnership, and we will affirm that portion of the decree.

The court also held that Hooper was liable to the partnership for $130,000, the value of parcel B reflected in the deed to the Hoopers. Hooper's claim in the trial court that he was holding the property in trust for the partnership was unsupported by the evidence and contradicted by the deed. Finding that Hooper had failed to account for the taking of partnership property, the court awarded judgment in favor of the partnership for its value.

Hooper did not contest the point on brief or in oral argument before this Court, and we will uphold the chancellor's ruling.

Finally, Hooper assigns error to the court's authorization of the sale of his partnership interests to satisfy the judgment in favor of the partnership. Pointing out that the judgment against him is the partnership's sole asset, and that a purchaser of his interest would acquire merely the right to enforce 60% of the judgment against him, Hooper contends that the only persons likely to bid are Musolino, John Warner, and Hooper. Hooper argues that if he "is unable to 'outbid' Musolino and John Warner for his own interest in the judgment, then Musolino and John Warner will be able to leverage their 40% interest in the judgment . . . into a 100% interest". Hooper complains that the court should not have placed him in the position of having to bid for the right to collect a portion of the judgment from himself.

We see no prejudice in the chancellor's ruling. Hooper is a judgment debtor. As such, all his assets, including his interests in the partnership, are subject to public sale in satisfaction of the judgment. The post-judgment remedy authorized in the decree merely eliminates the requirement of a writ of *fieri facias*. In the exercise of its equity jurisdiction, a court is afforded broad discretion in fashioning complete and just relief, *Sumner* v. *Staton*, 151 N.C. 198, 201-02, 65 S.E. 902, 904 (1909); *Chamberlain* v. *Beam*, 63 N.C.App. 377, 380, 304 S.E.2d 770, 772-73 (1983), and we hold that the chancellor did not abuse his discretion in authorizing a public sale of Hooper's interests in the partnership.

The judgment of the trial court will be affirmed in part and reversed in part. We will modify the decree to exclude recovery for the unencumbered value of parcel A and will enter final judgment here in favor of the partnership for $3,930,000.

*Affirmed in part,*
*reversed in part,*
*modified, and final*
*judgment.*